## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

|  |  |
|---|---|
| GREGORY M. SHEPARD,<br><br>      Plaintiff,<br><br>vs.<br><br>EMPLOYERS MUTUAL CASUALTY<br>COMPANY AND BRUCE G. KELLEY,<br><br>      Defendants. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR BREACH OF FIDUCIARY DUTY

Plaintiff Gregory M. Shepard ("Shepard"), by and through his undersigned counsel, respectfully submits this Complaint for breach of fiduciary duty against Employers Mutual Casualty Company ("EMCC") and Bruce G. Kelley ("Kelley"), and alleges as follows.

## SUMMARY OF BREACH OF FIDUCIARY DUTY CLAIM

1. This action arises from gross breaches by EMCC and Kelley of the fiduciary duties they owed to Shepard. Shepard was one of the largest minority public shareholders of EMC Insurance Group Inc. ("EMCI"), until EMCI's controlling shareholder EMCC squeezed him out on September 19, 2019 and took EMCI private (the "Squeeze-out"). While Shepard was a shareholder of EMCI, EMCC and Kelley owed Shepard and other EMCI minority shareholders a fiduciary duty to enhance and promote the business and value of EMCI and maximize its share price. While, EMCC and Kelley also owed fiduciary duties to the insurance policyholders of EMCC, they plainly could have satisfied their fiduciary duties to both EMCC's policyholders and to EMCI's minority shareholders, but elected not to do so.

1

**Non-Public Version Filed Under Seal**

2.      EMCC and Kelley were seriously conflicted in their dual roles as fiduciaries for two different stakeholders: the policyholders of EMCC and the public shareholders of EMCI.  As fiduciaries to EMCC's policyholders, EMCC and Kelley owed a duty to those policyholders to act in their best interests, including to attempt to keep their insurance premiums as low as possible.  In contrast, EMCC and Kelley owed EMCI's public shareholders a duty to maximize EMCI's share price, which required promoting the value of EMCI and seeking to increase the profits EMCI earned from insurance policies it sold.  Those dual fiduciary duties were at odds with each other.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  Unfortunately for EMCI and Shepard, EMCC and Kelley resolved this conflict by favoring EMCC, to the detriment of EMCI and Shepard.

3.      EMCC and Kelley structured EMCI as a shell company with no employees or operating assets of its own, which prevented EMCI from ever growing into a valuable company in its own right or from acting independently from EMCC.  EMCI had no employees or senior executives of its own, and did not have its own brand or business relationships.  EMCI also had no underwriting, claims service, or investment management capabilities of its own; nor even information technology systems to quote, issue, bill, and service policies or administer its claims or investments.  All of EMCI's business arose from, and was managed by, EMCC.  Kelley and EMCC kept EMCI under their thumb by causing EMCC to employ staff and senior executives who then worked part-time on behalf of EMCI, and EMCI paid EMCC for those services.  The only individuals working exclusively for EMCI were its independent Board directors (who EMCC largely ignored).  This meant that EMCI was wholly dependent on EMCC to conduct all business of EMCI, including matters as basic and simple as a budget or financial analysis.

**Non-Public Version Filed Under Seal**

4.     EMCC and Kelley breached their fiduciary duties to Shepard by refusing to promote the business and value of EMCI and by refusing to maximize EMCI's share price for the benefit of Shepard and its other minority public shareholders, despite repeated requests from EMCI's independent directors that EMCC and Kelley take specific action to promote the value of EMCI and seek to maximize its share price.

5.     EMCC and Kelley benefited from causing EMCI to become a public company because it gave them access to the public equity markets.  But when that benefit was no longer attractive to Kelley and EMCC, they opportunistically squeezed out EMCI's minority public shareholders when EMCI's share price hit a near-two-year low.  EMCC also refused to consider alternatives to the Squeeze-out that EMCI's independent Board members proposed, and EMCC advised EMCI's Board that it would not consider any offers by third parties as alternatives to the Squeeze-out.  In fact, while strategic acquisitions are common in the insurance industry, EMCC was never willing to entertain any strategic stock acquisitions or mergers to enhance the value of EMCI.  Had EMCC and Kelley not breached their fiduciary duties, EMCI would have been a much more valuable company than it was when EMCC took EMCI private on September 19, 2019.  Because EMCC and Kelley breached the fiduciary duties they owed to Shepard as an EMCI stockholder in the years leading up to the Squeeze-out, Shepard has filed this breach of fiduciary lawsuit.

6.     EMCC is a mutual insurance company that was founded in 1911 by defendant Kelley's great-grandfather.  Mutual insurance companies are notorious for lacking accountability and lacking pressure to improve performance.  As one commentator noted in comparing a public insurance company to a mutual insurance company:

**Non-Public Version Filed Under Seal**

> The capital markets are a wonderful disciplinarian.  Every day, you look at your stock price, and if it isn't performing, the onus is on you to get your house in order.  Mutuals just don't have [that] kind of pressure to perform-that kind of accountability.  Moreover, they generally have higher expense structures, lower returns on capital, and lower growth rates.

James A. Smallenberger, *Restructuring Mutual Life Insurance Companies: A Practical Guide Through the Process*, 49 Drake L. Rev. 513, 522-23 (2001).  ██████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████  Other commentators have noted that mutual insurance companies were originally formed when "farmers and ordinary workers found it hard to find insurers" and therefore "banded together to form their own [insurance companies]," but mutual insurance companies have morphed into antiquated corporate structures designed to benefit the corporate insiders, like Kelley, who run them:

> [The mutual insurance company industry] has grown into something else entirely: an opaque, poorly understood  . . . world in which some executives and insiders operate with minimal scrutiny and, no coincidence, often reap maximum personal rewards.

Deirdre Fernandes & Todd Wallack, *A Rich Financial Realm Run Almost Without Oversight,* Bos. Globe (June 6, 2015, 8:14 PM),  https://www.bostonglobe.com/business/2015/06/06/ big-companies-little-scrutiny/Ey4KCvQRrmpIkWllj9wUwN/story.html?outputType=amp.

7.     Until September 19, 2019, EMCC was the majority shareholder of EMCI, which was a publicly-traded property and casualty insurance holding company that was spun-off of EMCC by Kelley's father in 1974.  Shepard was one of the largest minority shareholders of EMCI, owning 1.1 million shares of EMCI's stock.  Shepard was a longtime shareholder of EMCI, having first acquired EMCI shares in October of 2005.

4

8.      On November 16, 2018, EMCI announced that it had received an offer from EMCC to acquire the outstanding shares of EMCI's minority shareholders at $30 per share, which offer was subsequently increased to $36 per share.  After EMCC made its offer to squeeze-out minority shareholders, EMCC made crystal clear to EMCI's independent directors that it would not consider any third-party offers and would not consider any alternatives to promote the value of EMCI while keeping it a public company.  EMCC left EMCI's Board of Directors no choice but to agree to EMCC's offer to squeeze-out minority shareholders and take EMCI private.  A majority of the minority shareholders of EMCI voted in favor of the Squeeze-out on September 18, 2019.  Shepard voted against the Squeeze-out and exercised his right to an appraisal of his 1.1 million shares of EMCI.[1]  On September 19, 2019, EMCC completed its Squeeze-out of EMCI's minority shareholders.

9.      After EMCI publicly announced EMCC's proposal to squeeze-out the minority shareholders, Shepard requested that EMCI provide documents concerning the proposed Squeeze-out, and alternatives to the proposed Squeeze-out that EMCI had considered.  EMCI refused to provide most of the documents Shepard requested, and refused to produce any documents concerning specific alternatives EMCI had considered to increase its share price.  Shepard was therefore forced to seek a court order compelling production of the requested documents.  The documents that the Court ordered EMCI to produce, as well as other documents that EMCI publicly

---

[1] In this action, Shepard contends that EMCI's share price would have been much higher on September 19, 2019 had EMCC and Kelley not breached the fiduciary duties they owed to Shepard.  In  his state court appraisal action, Shepard will contend that even setting aside the breaches of fiduciary duty by EMCC and Kelley that depressed EMCI's share price, the $36 per share that EMCC paid in the Squeeze-out was not a fair price based on the fair value of EMCI on September 19, 2019.

**Non-Public Version Filed Under Seal**

filed as part of the Squeeze-out, revealed for the first time that EMCI's controlling shareholder, EMCC, and Kelley, had both grossly breached their fiduciary duties to EMCI's minority shareholders in the years leading up to the Squeeze-out.

10.     As a majority, controlling shareholder of EMCI, EMCC owed fiduciary duties to EMCI and EMCI's minority shareholders, including to attempt to promote the value of EMCI for the benefit of EMCI's public shareholders.  Kelley served as a director on EMCI's Board of Directors and as its CEO, and as such, Kelley owed fiduciary duties, under both statutory and common law, to both EMCI and its public shareholders, including to attempt to promote the value of EMCI for the benefit of EMCI's public shareholders.  *See* IBCA § 490.830; IBCA § 490.842. Kelley also served as the CEO of both EMCI and EMCC, and as a director of EMCC.

11.     While EMCC benefited from raising capital from EMCI's minority public shareholders, EMCC was unwilling to take actions recommended by EMCI's independent directors to promote the value of EMCI and maximize its share price, so as to benefit those minority public shareholders.  Kelley and EMCC's senior executives – who were also senior executives of EMCI – were content to focus on running the family business, EMCC, a sleepy mutual insurance company, while ignoring EMCI, a public company.  As a result, EMCI's performance, being essentially a share in EMCC's passable performance, greatly lagged that of its peer public companies.

12.     The business relationship between EMCC and EMCI was also structured in a way that greatly inhibited EMCI's value, as EMCC and Kelley full well knew, but EMCC and Kelley refused to change that business relationship.  Furthermore, EMCC took numerous steps to ensure that EMCI never developed or grew into a valuable company in its own right.  EMCC operated EMCI as a shell company with no employees or business of its own.  EMCC and Kelley made sure

**Non-Public Version Filed Under Seal**

that EMCI was entirely dependent on EMCC and its management (headed by Kelley) to conduct

its business.  EMCI was a mere instrumentality of EMCC and entirely dependent on EMCC.  Under

the pooling agreement, EMCC forced EMCI to send all of its premium revenue and loss expenses

on its insurance policies to EMCC, and EMCI was forced to take back 30% of the premium revenue

and loss expenses from a pool of EMCC's and EMCI's combined business together.  As a result,

EMCI was not viewed in the industry as having a business value of its own.  EMCI's financial

results were dragged down by EMCC's results, which lagged the industry.

13.     The terms of the pooling agreement were dictated by EMCC and were not

negotiated at arms-length due to EMCC's control of EMCI.  The pooling agreement depressed

EMCI's value while benefiting EMCC.  The pooling agreement benefited EMCC to EMCI's

detriment, because the insurance policies EMCI sold were more profitable than the policies EMCC

sold.  In effect, the pooling agreement effectively required EMCI to subsidize EMCC's relatively

poor performance.  Indeed, EMCI's independent directors repeatedly asked (and independent

consultants also recommended) that EMCC either renegotiate the terms of the pooling agreement,

or abandon the pooling agreement altogether in favor of an arrangement that enabled EMCI to

grow and become more profitable – which alternative arrangement EMCI's independent directors

further recognized would benefit EMCC as well.  But EMCC and Kelley had no desire to

implement any operational changes that would promote the value and business of EMCI.

14.     EMCI's independent directors, as well as other independent third parties, noted █

██████████████████████████████████████████████████████████████

████████████████████████████████  But Kelley, EMCC's other directors, and EMCC's

senior management did nothing.  █████████████████████████████

7

███████████████████████████████████████████████

██████████████

15.     EMCI's status as a public company provided EMCC with the ability to raise capital in the equity markets, which was unavailable to EMCC as a mutual insurer with no ability to issue capital stock.   But public companies like EMCI also have drawbacks, such as increased transparency, public reporting requirements, and independent directors who must oversee the public company, and who also have fiduciary duties to maximize the public company's value.

16.     EMCC had every incentive to take EMCI private at the lowest price possible.   In particular, EMCC and Kelley wanted to silence EMCI's independent directors who were a thorn in their side.   So EMCC and Kelley simply waited until the right opportunity came to squeeze-out EMCI's minority shareholders.   The opportunity to acquire EMCI's minority shares at a rock-bottom price came in the Fall of 2018 when EMCI's share price hit a near-two-year low.   ████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████   Kelley and EMCC seized the opportunity to acquire EMCI's shares held by the public at a near two-year-low price.   They forced out EMCI's minority shareholders and rid themselves of EMCI's pesky independent directors.   While EMCC claims it paid a premium over EMCI's market price to acquire EMCI's shares, the market price was at a near all-time record low.   In any event, a premium on the market price is customary in all merger transactions.   Thus, if EMCC had not opportunistically waited until EMCI's shares hit a near two-year low to squeeze-out minority shareholders, EMCC still would have paid a premium to acquire EMCI's shares.   Moreover, when EMCC squeezed-out Shepard as a minority shareholder of EMCI at a price of $36 per share, EMCI claimed that the $36 per share reflected the "fair value" of EMCI's shares at

8

the time the Squeeze-out was effectuated.  Thus, EMCI did not pay Shepard (or the other minority shareholders) a premium over the purported fair value of his EMCI shares.

17.     The limited evidence that EMCI was forced to turn over in response to the Court's order granting Shepard's books and records demand makes abundantly clear that Kelley and EMCC grossly breached their fiduciary duties to Shepard and EMCI's other minority public shareholders in the years leading up to the Squeeze-out.

18.     As far back as August 2013, Crane – a highly experienced insurance executive and EMCI's independent Board Chairman – ███████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████

19.     Undeterred, ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ tellingly, EMCC and Kelley never suggested a single proposal of their own to promote the value of EMCI, and never took action to work with EMCI's Board to develop proposals to promote EMCI's value.  Because EMCI had no employees of its own, Crane and EMCI's other "independent" directors were in fact completely dependent on EMCI's majority shareholder, EMCC, to operate EMCI's business and

9

to take action to promote EMCI's value.  Without the cooperation of EMCC and its senior management, including EMCC's CEO Kelley, the hands of EMCI's independent directors were tied, as EMCC intended.

20.     In November 2017, Peter Christie ("Christie") joined EMCI's Board as an independent director.  Like Crane, Christie had decades of experience in the insurance industry. After Christie joined EMCI's Board, EMCC and Kelley faced even greater pressure to act in EMCI's best interests and to promote EMCI's value.  Between August 2018 and November 15, 2018 alone, Crane or Christie █████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████

21.     Under relentless pressure from EMCI's independent directors to take action to promote EMCI and maximize its lagging share price, Kelley and EMCC finally had enough. EMCI's share price had recently hit a near-two-year low, and Kelley and EMCC seized on the opportunity to buy-out EMCI's minority shareholders and rid themselves of EMCI's pesky independent directors Crane and Christie once and for all.  After the close of business on November 15, 2018, EMCC offered to acquire the outstanding minority shares of EMCI at $30 per share (which was later increased to $36 per share).

22.     After EMCC made its offer to acquire EMCI's minority shares, EMCI's independent directors formed a Special Committee to consider the offer, and also hired a financial advisor, Sandler O'Neill & Partners, L.P. ("Sandler O'Neill").  After speaking with EMCI's senior management – who also served as senior management for EMCC – and reviewing materials, Sandler O'Neill quickly came to the conclusion that for years EMCC had been solely looking out

Non-Public Version Filed Under Seal

for EMCC's own interests to the detriment of EMCI, and that EMCC had made no attempts to promote EMCI's value.

23.     In a February 5, 2019 presentation to the Special Committee, Sandler O'Neill specifically pointed out that EMCI was being run as if it were a mutual insurance company, rather than a public company, which caused EMCI to perform poorly, and that EMCC was favoring its own policyholders over EMCI's public shareholders, stating:

> "Management's proclivity to manage [EMCI] with the same operating philosophy as [EMCC] has resulted in 'policyholder [EMCC] value maximization' taking precedence over 'value maximization for [EMCI's] shareholders'"

The February 5, 2019 Sandler O'Neill presentation further stated the EMCC advanced its own interests over those of EMCI, stating:

> "In case of conflicts between goals and objectives of [EMCI] and [EMCC], the latter [EMCC's goals] appears to take precedence."

24.     But Sandler O'Neill also noted that EMCC could have managed the two companies so as to benefit both companies.  In a February 5, 2019 presentation, Sandler O'Neill stated that the "improvement of EMCI's results and market price will for EMCC create an attractive investment, diversification, executive incentives and capital access" for EMCC.   EMCI's independent directors had likewise repeatedly stressed to Kelley and EMCC that they could promote EMCI's value while still benefiting EMCC.  But these statements by Sandler O'Neill and EMCI's independent directors fell on deaf ears at EMCC.  EMCC and Kelley simply had no desire to make operational changes to EMCI that would promote EMCI's business.  Kelley was content to manage EMCI like he was managing EMCC – as a sleepy, family run mutual company where senior management positions are handed down from generation to generation without regard to competence.  Moreover, EMCC and Kelley were also inherently conflicted, because the pooling

11

agreement between EMCC and EMCI was subsidizing EMCC's poorer performance.  EMCC and Kelley did not want to take any action that they thought would benefit EMCI – even though Crane and Christie repeatedly pointed out that action could be taken to grow *both* EMCI and EMCC.

25.     In a different February 5, 2019 presentation, Sandler O'Neill further noted that ████ █████████████████████████████████████████████████████████████████████████████ According to Sandler O'Neill, the reason EMCI lagged its peer group was because EMCC was forcing ████████████████████████████████████████████████ that solely benefited EMCC, and depressed EMCI's share price.  Sandler O'Neill candidly stated that the price at which EMCC offered to acquire minority shares of EMCI ██████████████████ █████████████████████████████████████████████████████████████████ ██████████████████████████████ Sandler O'Neill recommended that EMCI's Special Committee either insist ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████

26.     In making its offer to acquire EMCI's outstanding stock, EMCC made it crystal clear that it would not agree to any of the proposals that EMCI's independent directors had previously made to promote EMCI's value while keeping EMCI a public company, and rejected all the alternative proposals made by Sandler O'Neill to increase EMCI's share price before squeezing-out minority shareholders.

27.     After EMCC announced its offer to acquire EMCI's outstanding shares, EMCC received a joint venture proposal from a third-party █████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████

12

**Non-Public Version Filed Under Seal**

███████████████████████████████████████████████████████████

███████████████████████████████████  EMCC also then publicly announced that it would not

sell its own shares of EMCI and would not consider a transaction that involved the merger of

EMCC with or into a third party.  It was EMCC's way or the highway: either EMCI's Board of

Directors agree to the Squeeze-out on terms EMCC dictated, or the status quo for EMCI would

continue, meaning none of the steps that the EMCI's independent directors and independent

consultants had suggested that EMCC should implement to increase EMCI's value and

profitability would be taken.  Because the status quo had been unacceptable to EMCI's

independent directors for many years, EMCI's independent directors were left with no choice but

to agree to EMCC's proposal to squeeze-out minority EMCI shareholders.  EMCI's Board of

Directors voted in favor of the Squeeze-out, and the Squeeze-out was completed on September 19,

2019.

## THE PARTIES AND NON-PARTIES

28.     Shepard was a longtime shareholder of EMCI, having first acquired shares of

EMCI's common stock in October of 2005.  At the time EMCI filed its preliminary proxy on June

24, 2019, Shepard owned 1.1 million shares of common stock in EMCI, or approximately 5% of

EMCI's total outstanding stock.  As of the date of this Complaint, Shepard  is a citizen of and

resides in Lakewood Ranch, Florida.

29.     EMCI was a publicly-traded insurance holding company that traded on the Nasdaq.

EMCI was incorporated under the laws of, and maintained its principal place of business in, Iowa.

Through its subsidiaries, EMCI conducted property and casualty insurance business lines and

reinsurance business.  Those subsidiaries were: EMCASCO Insurance Company, Illinois

EMCASCO Insurance Company, Dakota Fire Insurance Company, and EMC Reinsurance

**Non-Public Version Filed Under Seal**

Company.  Following the Squeeze-out of EMCI's minority shareholders by EMCC, EMCI became

a privately held, wholly-owned subsidiary of EMCC.  EMCI was headquartered at 717 Mulberry

Street, Des Moines Iowa 50309, the same address as the headquarters of EMCC.

30.     Between 2013 until the Squeeze-out in September 2019, EMCI had five directors,

four of whom were independent, and Kelley.  Until the Squeeze-out in September 2019, Crane

was  the  Chairman  of  EMCI's  Board  of  Directors.   Crane  had  been  an  EMCI  director  for

approximately ten years, since 2009.  Crane has decades of experience in the property and casualty

insurance business.  For example, he served as a CEO of multiple insurance companies and was a

Board member of a different insurance company.

31.     In November 2017, Peter Christie joined EMCI's Board as an independent director.

Like Crane, Christie has decades of experience in the insurance industry.  For example, Christie

has served an independent director for a number of insurance companies.  He also served as the

CEO for an international insurance broker.

32.     EMCC is a mutual insurance company incorporated under the laws of Iowa, which

operates property and casualty insurance business lines.  EMCC's headquarters and principal place

of business are in Des Moines, Iowa.  During all times relevant to this complaint, EMCC was the

majority shareholder of EMCI.  EMCC is the parent company of a group of subsidiary companies

known  as  EMC  Insurance  Companies,  which  do  business  in  all  50  states  and  the  District  of

Columbia.  Between 2013 and the Squeeze-out in September 2019, EMCC had either ten or eleven

directors.

33.     Kelley was EMCI's CEO, and he also served as EMCC's CEO.  Kelley was also a

member of the Board of Directors for both EMCI and EMCC.  All of EMCI's other officers were

also officers of EMCC.  Kelley resides in Des Moines and is a citizen of Iowa.  Kelley succeeded

14

his father who succeeded his grandfather, who succeeded his great-grandfather as chairman and CEO of EMCC.

## VENUE AND JURISDICTION

34.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), because plaintiff and defendants are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

35.     This Court has personal jurisdiction over defendants EMCC and Kelley because they are both citizens of this State and conduct business in this District, and because the events at issue in this litigation substantially took place in this District.

36.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because (1) EMCC and Kelley are located in this District and (2) a substantial part of the events giving rise to this lawsuit occurred in this District.

## BACKGROUND

A.     **The History of EMCC and EMCI.**

37.     EMCC was founded as a mutual insurance company by John Alexander Gunn in 1911.

38.     Kelley is the great grandson of EMCC's founder, John Gunn.  Kelley is EMCC's current President and CEO and is a member of EMCC's Board of Directors.  Kelley has worked at EMCC since 1985 and is the fourth generation of his family to run EMCC.  It is not unusual for mutual insurance companies to be sleepy family-run businesses, with the reins of management handed down from one generation to the next.

39.     Mutual insurance companies such as EMCC are able to be sleepy businesses with lackluster performance and mediocre talent because they are owned by their policyholders.  Those

15

insurance policyholders are typically not interested in the management of the mutual insurance company or its results.  Their only concern is the amount in premiums they are charged for their policies. ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ Mutual insurance companies also face diminished access to capital because they cannot raise money through the equity markets.

40.     EMCI was spun-off from EMCC and incorporated in Iowa in 1974 by Kelley's father.  EMCI became a public company in 1982 following its initial public offering of common stock.  Following its initial public offering, EMCC owned approximately 92% of EMCI's stock.

41.     In 1985, EMCI had a secondary offering, reducing EMCC's stock ownership interest in EMCI to approximately 65%.

42.     In 2004, EMCI had another secondary offering, reducing EMCC's stock ownership interest in EMCI to approximately 55%.  The 2004 public stock offering was EMCI's last stock offering before EMCC squeezed-out minority shareholders.  If EMCI would have had another secondary public stock offering after 2004, it would have diluted EMCC's stock ownership interest in EMCI.  EMCC was not willing to take any action that would have resulted in EMCC losing control of EMCI.  But by foregoing additional secondary stock offerings after 2004, EMCI lost the opportunity to raise additional capital, which additional capital could have been used to enhance and promote EMCI's value, including by increasing EMCI's percentage in the pooling agreement.

43.     Just prior to September 19, 2019 when EMCC closed the Squeeze-out, EMCC owned approximately 54% of EMCI's common stock.

16

**Non-Public Version Filed Under Seal**

44.     Since EMCI became a public company in 1982 until the time EMCC squeezed-out EMCI's minority shareholders on September 19, 2019, EMCC has owned a majority of EMCI's common stock and has been a controlling shareholder of EMCI.   Following the Squeeze-out, EMCI became a privately held, wholly-owned subsidiary of EMCC.

45.     Before the Squeeze-out, Kelley served as the CEO and President of EMCI, and held both roles since 1992.   In addition, between 1991 and the Squeeze-out in September 2019, Kelley was a director of EMCI (in addition to being the CEO and a director of EMCC).

**B.     The Business Arrangement Between EMCI and EMCC.**

46.     The business arrangement between EMCI and EMCC was structured to benefit EMCC to EMCI's detriment.   As Christie, EMCI's independent director observed ███████████

███████████████████████████████████

███████████████████████████

47.     EMCC ensured that EMCI operated as a shell company entirely dependent on EMCC.   EMCI was forced to rely entirely on EMCC's employees, facilities and information technology systems to conduct its business.   EMCI described itself as a "virtual" company.   EMCI did not employ a single employee of its own to conduct its operations.   Nor did EMCI own or lease any facilities or information technology systems necessary for its operations.   Rather, using EMCC's employees, EMCI conducted operations in property and casualty insurance and reinsurance through its subsidiaries.   EMCC then charged EMCI for those employees and services.

48.     EMCI and EMCC, through their subsidiaries, issued property and casualty insurance policies.   The majority of the insurance policies that were issued were commercial policies.   On October 29, 2018, EMCI and EMCC announced that they had made a strategic

**Non-Public Version Filed Under Seal**

decision to exit the personal lines business by early 2020 so that more time and resources could be dedicated to the commercial lines insurance and the reinsurance businesses.

49.     For insurance policies issued by the subsidiaries of EMCI and EMCC, EMCI and EMCC allocated premiums from those insurance policies and claims made on those insurance policies based on a pooling agreement.  Under the pooling agreement, the revenue and expenses were allocated 70% to EMCC and 30% to EMCI.  Neither EMCI nor EMCC has publicly disclosed how it was determined which policies are allocated to each company.

50.     Christie observed ███████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

## C.     EMCI Lagged Its Peer Group.

51.     For a number of years prior to when EMCC announced in November 2018 its offer to squeeze-out minority public shareholders, EMCI lagged its peer group in a number of different metrics.

52.     EMCI's share price-to-book value multiple lagged that of its peer group.  For example, as of June 30, 2018, EMCI's price-to-book value multiple of ███████████████

████████████████████████████████████████████████████████████████

███████████████████████████

18

53.     EMCI's total annual stockholder return (capital appreciation and dividends) also lagged that of its peer group.  For example, for the ten year period between September 30, 2008 and September 30, 2018, EMCI returned 5.7% annually.  In contrast, during that same period, six companies that EMCI considered to be its peers had substantially higher annual returns – between

████████████

**D.     EMCC and Kelley Intentionally Stunted EMCI's Opportunities For Growth By Operating EMCI as a Shell Company.**

54.     As Crane and independent third parties observed, EMCC's refusal to allow EMCI to develop into its own company with independent management was one reason why EMCI's growth had been depressed.

**Non-Public Version Filed Under Seal**

██████████████████████████████████████████████████████

████████████

58.     Kelley and EMCC's senior management had no incentive to allow EMCI to be independently managed, and every incentive to either keep EMCI a virtual company or squeeze-out EMCI's minority shareholders and merge EMCI into EMCC.  Kelley's family had run the company for generations and had no interest in giving up control of the company or turning over decision making authority to independent management of EMCI.

**E.      EMCC and Kelley Refused to Modify the Parties' Pooling Agreement or to Take Other Action to Promote EMCI's Value.**

59.     For a number of years before the Squeeze-out, EMCI's independent directors were raising concerns with Kelley and EMCC's management and directors ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████  Because EMCI had no employees of its own, EMCI's "independent" directors were wholly dependent on EMCC and its management, including Kelley, to take steps to explore and implement the suggestions of EMCI's independent directors.  However, Kelley and EMCI either outright ignored the repeated requests of EMCI's independent directors, or Kelley and EMCC promised to look into EMCI's requests, but never followed through on those promises.

60.     Shepard learned this year that ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

20

**Non-Public Version Filed Under Seal**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

61.    Shepard learned this year that ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

62.    Shepard learned this year that ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

**Non-Public Version Filed Under Seal**

████████████████████████████████████████████████████████████████

██████

63.     Dissatisfied with Kelley and EMCC's lack of efforts to promote EMCI's value,

██████████████████████████████████████████████████████████ Shepard

learned this year that ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████

64.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

22

**Non-Public Version Filed Under Seal**

65.

68.

**Non-Public Version Filed Under Seal**

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

69.    On information and belief, EMCC and Kelley not only ████████████

████████████████████████████████████████████████

████ but also refused to consider the proposals to promote EMCI's value ████████

████████████████████████████████████████

70.    In December 2016, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

72.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

24

**Non-Public Version Filed Under Seal**

█████████████████████████ In contrast, EMCI was unique in that it only received 30% of the premiums under its pooling agreement with EMCC.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

74.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ But, once again, Kelley and other senior executives of EMCC stonewalled EMCI. ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ Instead, EMCC and Kelley continued to refuse to take action to grow EMCI – even though such actions could have also benefitted EMCC.

75.   Time continued to pass, and EMCC and Kelley continued to do nothing to promote EMCI's value.

76.   Analysts covering EMCI began to question what action EMCI would be taking to improve its share price.  During EMCI's August 7, 2018 earnings call, John Deysher of Bertolet Capital Trust - Pinnacle Value Fund, observed that EMCI had not been successfully growing, and

25

asked EMCI's management (which was also EMCC's management) what EMCI intended to do to promote EMCI's value, stating:

> final question is the release indicates that commercial auto and personal lines continue to underperform expectations. I'm just wondering what the board is doing to fix these particular segments. This has been ongoing for many quarters, and I'm just wondering specifically what the board is doing and what kind of benchmarks you can put out there in terms of indicating to shareholders that there's actually being progress made since it doesn't appear you're getting much traction.

77.     In response to Deysher's question, Mike Lovell – the executive vice president of operations for both EMCI and EMCC – recognized that EMCI's performance was "troubling" and that EMCI's "biggest concern" is "it's not operating as we want it to."  Yet EMCC continued to do nothing.

78.     Deysher then concluded by remarking: "I hope the Board of Directors is engaged here in terms of moving this forward and that there's a sense of urgency in terms of improving these operations so shareholders should benefit."  Kelley responded that the Board would be meeting in two weeks and is "concerned with those 2 issues."  Yet there is no indication that Kelley or the EMCC Board took any steps to improve EMCI's value despite the recognized "sense of urgency."

79.     Peter Christie who had recently joined EMCI's Board in November 2017 (to replace Robert Howe) ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

**Non-Public Version Filed Under Seal**

81.

**Non-Public Version Filed Under Seal**



28

88.     By November 15, 2018, Kelley and EMCC had enough ███████████████ that Kelley and EMCC take action to promote EMCI's value.  After the close of business on November 15, 2018, when EMCI's stock price was near a two-year low, EMCC made a proposal to take EMCI private by buying EMCI's outstanding shares at $30 per share.

**F.      EMCC Opportunistically Squeezed-Out Minority Shareholders of EMCI.**

29

89.   ███████████████████████████████████████████████

██████████████████████████, Kelley and EMCC had been looking for the right opportunity

to buy out EMCI's minority shareholders and rid themselves of EMCI's pesky independent

directors.  Kelley and EMCC had no desire whatsoever to grow EMCI's business, even though

growing EMCI's business also would have benefited EMCC.  Kelley was content to run EMCI

just like he was running EMCC – as a sleepy, family-run mutual insurance company handed down

from generation to generation, with lackluster results.  EMCC and Kelley were also inherently

conflicted, because the pooling agreement between EMCC and EMCI was subsidizing EMCC's

poor performance.  EMCC and Kelley refused to take any action that would benefit EMCI– even

though ███████████████████████ that action could be taken to grow *both* EMCI

and EMCC.

90.   EMCC formed a plan to take EMCI private when the time was right – that is, when

EMCI's stock price was at its lowest value.  ████████████████████████████████

███████████████████████████  EMCI's stock traded at $23.69 at the close

of trading on March 31, 2014 and, █████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

91.   In 2016, it was generally understood that EMCC continued to lack sufficient

financial means to take EMCI private given the price at which EMCI's stock was trading.

92.   EMCC intentionally took no steps to improve EMCI's value, it simply waited for

the right time to announce a squeeze-out to take EMCI private.  While it waited, EMCC and Kelley

refused to take meaningful action to try to maximize EMCI's share price and ignored the demands

of EMCI's independent directors that Kelley and EMCC make operational changes to promote

**Non-Public Version Filed Under Seal**

EMCI's business.  Indeed, once EMCC began considering a squeeze-out, maximizing EMCI's share price was no longer in the best interest of EMCC or Kelley, because EMCC and Kelley desired to take EMCI private at the lowest price possible.

93.     In 2017 and 2018, EMCI suffered unusual and substantial losses, including as a result of investment losses and several environmental catastrophes and storm losses.  In both 2017 and 2018, EMCI's catastrophe and storm losses were unusually high due to active weather patterns in the Midwest, increased typhoon and hurricane activity, and California wildfires.  In addition, in the fourth quarter of 2018, EMCI's management elected to recognize nearly $12 million in investment losses.  As a combined result, in 2018, for the first time in more than 15 years, EMCI lost money for a full year.  On November 14, 2018, EMCI's share price closed at $23.83 per share – which was near its two-year low closing price of $23.26 reached just a few weeks earlier on October 23, 2018.

94.     After the close of trading on November 15, 2018, the day after EMCI's share price hit its near-two-year low, EMCC opportunistically offered to acquire EMCI's outstanding shares at $30 per share.

95.     When EMCC made its offer to buy-out minority public shareholders on November 15, 2018, EMCI's discount to its peer group – meaning EMCI's share price as a multiple of book value compared to EMCI's peer group share price as a multiple of book value – was at its widest level in the last five years.  EMCI was grossly underperforming its peers, and that was because for years EMCC had intentionally refused to take steps to promote EMCI's value.

96.     EMCC's decision to opportunistically buy-out EMCI's minority public shareholders was long planned.  EMCC began in 2014 to analyze what it would cost to take EMCI private, and continued that analysis in subsequent years.  Indeed, before making its buy-out offer

**Non-Public Version Filed Under Seal**

in November 2018, EMCC had already retained Boenning & Scattergood, Inc. ("Boenning") as its financial advisor.

**G.     EMCI's Financial Advisor Correctly Concluded that EMCC Was Favoring Itself and Not Attempting to Promote EMCI's value.**

97.     After receiving EMCC's buy-out offer on November 15, 2018, EMCI's Board of Directors formed a Special Committee on November 20, 2018 to, in EMCI's words, "evaluate and negotiate the merger . . . [and] other alternatives available to the Company."   The Special Committee members were the independent directors of EMCI's Board.

98.     On November 21, 2018, EMCI publicly announced its receipt of EMCC's November 15, 2018 offer to acquire all of the EMCI stock owned by EMCI's minority shareholders.

99.     On December 19, 2018, the Special Committee selected Sandler O'Neill to serve as its financial advisor.

100.     After speaking with EMCI's senior management – who also served as senior management for EMCC – and reviewing materials, Sandler O'Neill quickly came to the conclusion that EMCC was looking out for EMCC's own interests and was not attempting to promote EMCI's value or maximize EMCI's share price.

101.     In a February 5, 2019 presentation to EMCI's Special Committee Sandler O'Neill candidly stated that EMCC was acting to benefit itself to EMCI's detriment, which was depressing EMCI's share price.   Sandler O'Neill observed:

- "Management's proclivity to manage [EMCI] with the same operating philosophy as [EMCC] has resulted in 'policyholder value maximization' taking precedence over 'value maximization for [EMCI's] shareholders'"

- There was a "[c]lash between operating objectives of [EMCC] and [EMCI] – policyholder value maximization vs. shareholders' value maximization"

32

**Non-Public Version Filed Under Seal**

- "Management believes that they are managing first and foremost a mutual company," referring to EMCC, which is a mutual company and not a publicly traded company like EMCI.

- "In case of conflicts between goals and objectives of [EMCI] and [EMCC], the latter appears to take precedence."

- "Long-term and short-term financial goals are focused on preservation and growth of statutory capital as opposed to enhancing underwriting profitability or return on capital"

- "Financial goals are set by [EMCC's] management team and approved by [EMCC's] Board of Directors" – not by EMCI.

102.    Sandler O'Neill also ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ According to Sandler O'Neill, ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Sandler O'Neill

recommended ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

According to Sandler O'Neill, EMCC should ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

33

**Non-Public Version Filed Under Seal**

█████████████████████████████████████████████████████████

████ [2]

## H.   EMCC Refuses to Consider any Option for EMCI Other than a Minority Squeeze-Out, Leaving EMCI With No Choice But to Accept EMCC's Buy-Out Proposal.

103.   After making an offer in November 2018 to squeeze-out EMCI's minority shareholders, EMCC made clear to EMCI that it would not consider any proposals from third parties for EMCC to sell its shares of EMCI or any transaction that would result in EMCC losing control over EMCI.

104.   On January 8, 2019, the Special Committee discussed whether it should solicit proposals to buy EMCI from any other potential buyers.  Because EMCC had made clear that it was not willing to sell its shares of EMCI or consider alternative transactions involving third parties, Sandler O'Neill advised EMCI's Special Committee ███████████████████████████ ████████████████████████████████████████  Though EMCC's offer did not prevent EMCI from soliciting third party proposals, EMCI's Special Committee determined not to even ask Sandler O'Neill to solicit proposals to buy EMCI's stock from any other potential buyers given

---

[2] While EMCC paid a premium to acquire EMCI's shares over its market price on the date EMCC announced its offer – which was near a two-year low – EMCC did not pay a premium over the fair value of EMCI's shares on September 19, 2019 when EMCI effectuated the merger, which fair value EMCI contends was $36 per share.  Moreover, $36 per share does not even reflect the fair value of EMCI's stock on September 19, 2019 when EMCI effectuated the Squeeze-out.  For that reason, Shepard has notified EMCI that he intends to exercise his appraisal rights to determine the fair value of his EMCI stock on September 19, 2019.  By exercising his appraisal rights, Shepard seeks to recover the difference between the $36 per share paid to him and the actual fair value of EMCI as it existed on September 19, 2019 – which was much higher than $36 per share.  If EMCC and Kelley had not breached their fiduciary duties, EMCI's fair value would have been even higher than it was on September 19, 2019, which Sandler O'Neill recognized.  Shepard seeks to recover in this breach of fiduciary duty lawsuit the difference between EMCI's fair value on the date of the Squeeze-out and what EMCI's fair value would have been if Kelley and EMCC had not breached the fiduciary duties they owed to Shepard.

Non-Public Version Filed Under Seal

that EMCI's largest and controlling shareholder, EMCC, had publicly stated that it was not willing, under any circumstances, to sell its stake in EMCI.

105.    By letter dated January 23, 2019, EMCC informed Crane, EMCI's Special Committee Chairman, that EMCC had received an unsolicited proposal nearly a month earlier in mid-December 2018, from a group of investors with NEO to form a joint venture with EMCI/EMCC.   In mid-December 2018, unbeknownst to EMCI, NEO had ████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████

106.    NEO's joint venture proposal followed shortly after EMCI publicly announced in November 2018 that EMCC had made an offer to acquire EMCI's outstanding common stock. Despite receiving NEO's proposal in December 2018, EMCC sat on the proposal for over a month before sharing it with EMCI's independent directors.   EMCC rejected NEO's proposal outright, before even giving EMCI's independent directors a chance to review or consider it.

107.    After rejecting NEO's joint venture proposal, EMCC again made clear that it was unwilling to consider other third-party transactions involving EMCI or EMCC.   By letter dated January 31, 2019 to EMCI's Special Committee, which was publicly filed with the SEC on February 1, 2019, EMCC again stated that it would not consider any transaction brought by EMCI's Special Committee or any other party that involves the merger of EMCC with or into a

35

**Non-Public Version Filed Under Seal**

third party.  EMCC stated that it had been operating as an independent mutual insurance company for 108 years – and Kelley's great-grandfather, grandfather, and father had run the company – and EMCC and Kelley intended to continue operating EMCC as it has always operated.

108.    Since EMCC made clear that it would not consider selling its shares of EMCI and would not consider alternative transactions with third-parties, EMCI's Special Committee attempted to convince EMCC to abandon its attempt to buy-out minority shareholders and instead take steps to promote EMCI's value while maintaining EMCI as a public company controlled by EMCC, but EMCC refused to take any such step.  In fact, EMCC even went as far as rejecting a provision to the merger agreement that would have required EMCC to support an alternative buyer's offer if it was at least 110% of the of the agreed upon $36 per share.

109.    Sandler O'Neill developed a proposal to keep EMCI as a public company while almost doubling EMCI's share price and bringing EMCI's return on equity more in line with its peer insurance companies.  Sandler O'Neill and the independent directors of EMCI believed that the proposed alternative arrangement would have benefitted both EMCI and EMCC.  In a February 22, 2019 presentation, Sandler O'Neill, using a discounted cash flow methodology, projected that the alternative proposal could result in an increase of EMCI's value to as high as $50.11 per share. The proposal Sandler O'Neill developed was nearly identical to one of the proposals that EMCI's independent directors had been asking EMCC to consider to no avail prior to the Squeeze-out.

110.    Sandler O'Neill presented its alternative proposal to EMCC on or about March 5, 2019.  EMCC rejected that alternative proposal ten days later, on March 15, 2019.  EMCC claimed that the Deputy Commissioner – Supervision of the Iowa Insurance Division orally informed EMCC that the alternative proposal, as presented by the unwilling EMCC, would "not likely" receive regulatory approval.  However, EMCC did not allow any independent representative of

36

EMCI to discuss the alternative proposal with the Iowa Division of Insurance or to present materials to the Iowa Division of Insurance supporting the alternative proposal.  And, on information and belief, when EMCI or EMCC had sought regulatory approval from the Iowa Division of Insurance for other transactions, all, or nearly all, of such transactions received approval.  EMCC never suggested a single alternative that would have been acceptable to the Iowa Insurance Division, and never offered to work with EMCI's Board to develop workable alternatives.  EMCC and Kelley were clearly only interested in buying out EMCI's minority shareholders and were not interested in supporting any proposal that would promote EMCI's value while keeping it a public company.

111.    Because EMCC was unwilling to take any action to promote EMCI's value while maintaining it as a public company controlled by EMCC and was unwilling to consider third-party offers with respect to EMCI, EMCI's independent directors – which were the members of the Special Committee – were left no choice but to agree to EMCC's squeeze-out of minority public shareholders.

112.    On March 20, 2019, EMCI's Special Committee determined that it would make a counter-offer of $40 per share to EMCC.

113.    In support of the $40 per share counter-offer, Sandler O'Neill presented EMCC with its valuations of EMCI's shares that Sandler O'Neill had performed.  Sandler O'Neill valued EMCI between approximately $39 and $46 per share as of December 31, 2018 using a discounted cash flow methodology.  Using four prior acquisitions of downstream public stock subsidiaries of mutual insurance companies, Sandler O'Neill's valued EMCI's shares between approximately $54 and $61 as of December 31, 2018 using the merger of a peer group method of valuing companies.

**Non-Public Version Filed Under Seal**

On March 22, 2019, Crane and Sandler O'Neill met with representatives of EMCC, and presented a counter-offer of $40 per share.

114.    On April 1, 2019, Steven Jacobs of EMCC told Crane of EMCI that EMCC's Board of Directors had rejected the $40 per share counter-offer.  EMCC then offered $33 per share.

115.    On April 4, 2019, Crane of EMCI informed Jacobs of EMCC that the Special Committee was rejecting $33 per share, and again requested $40 per share.

116.    On April 10, 2019, Jacobs of EMCC made a counter-offer of $36 per share, and stated that any further counter-offers by EMCI would be rejected.

117.    On April 16, 2019, Crane of EMCI made a counter-offer of $38 based on EMCI's improved first quarter of 2019 results.  Jacobs of EMCC rejected that $38 offer the same day. Crane then requested that EMCC pay a $1 special dividend in addition to paying $36 per share, which Jacobs again rejected that same day.  Jacobs demanded that the Special Committee tell EMCC by April 17 whether it would accept the $36 per share offer.

118.    On April 19, 2019, Crane of EMCI counter-offered at $37 per share.  Jacobs of EMCC said he would discuss EMCI's counter-offer, but that EMCC's offer of $36 per share would be withdrawn if it was not accepted by April 22, 2019.

119.    On April 20, 2019, Jacobs informed Sandler O'Neill that EMCC would not accept the $37 per share counter-offer.  That same day, the Special Committee decided to accept $36 per share.  The Special Committee notified EMCC on April 22, 2019 that it would accept $36 per share.  The merger agreement was then negotiated and drafted.

120.    On May 8, 2019, the Special Committee received an "updated" discounted cash flow analysis from Sandler O'Neill.  Although Sandler O'Neill's prior discount cash flow analyses used a discount rate of 9%, the May 8 discounted cash flow analysis used - for the first time - a

38

**Non-Public Version Filed Under Seal**

discount rate of 12.66%, which was *40% higher* than the discount rate used in its earlier valuations. The only reason for the change in the discount rate was to justify EMCC and Kelley's preferred price of $36 per share.  The same day, EMCI's Board of Directors (with Kelley recusing himself) agreed to the Squeeze-out.  Because Kelley and EMCC had refused for years to make operational changes to EMCI to promote its value and refused to propose any operational changes to EMCI to promote its value, because Kelley and EMCC had kept EMCI as a shell company, and because EMCC had made clear that it would not agree to any third party proposals with respect to EMCC or EMCI, EMCI's independent directors had no choice but to agree to the Squeeze-out.

121.    On June 24, 2019, EMCI issued a preliminary proxy announcing that EMCI's Board of Directors had approved the Squeeze-out at $36 per share, subject to a vote of the majority of the minority shareholders.

122.    On August 8, 2019 EMCI issued its final proxy, which set September 18, 2019 as the date for the shareholder vote on the Squeeze-out.  Shepard voted all of his EMCI shares against the Squeeze-out.  However, a majority of minority shareholders voted in favor of the Squeeze-out.

123.    The Squeeze-out was then effectuated the next day, on September 19, 2019.

**I.     Shepard Recently Learned of EMCC's and Kelley's Gross Breaches of Fiduciary Duty After the Court Ordered EMCI to Turn Over Documents to Shepard.**

124.    After EMCI issued its preliminary proxy on June 24, 2019, Shepard promptly requested on July 9, 2019 that EMCI produce the materials referenced in the preliminary proxy relating to the proposed Squeeze-out of minority shareholders and alternatives to a squeeze-out (including efforts to increase EMCI's share price to be more in line with its peers) that had been considered and rejected.

125.    EMCI refused to produce the majority of records that Shepard requested.

**Non-Public Version Filed Under Seal**

126.     On August 22, 2019, Shepard filed a petition in Iowa state court to compel EMCI to produce the records Shepard requested.

127.     The court granted Shepard's books and records petition by order dated September 10, 2019.

128.     Subsequently, EMCI stated that it had produced books and records pursuant to the court order.

129.     Through the books and records that EMCI produced to Shepard and materials that EMCI publicly filed this year, Shepard learned for the first time that EMCC and Kelley had breached the fiduciary duties that they owed to Shepard and other minority shareholders of EMCI.

## COUNT I

### (Breach of Fiduciary Duty against EMCC and Kelley)

130.     Shepard reasserts and re-alleges all of the preceding paragraphs as though fully set forth in this Count I.

131.      Defendants EMCC and Kelley owed Shepard fiduciary duties of care, loyalty and good faith.

132.     Defendants EMCC and Kelley breached their fiduciary duties when they, *inter alia* and as further described above, failed to promote the value of EMCI for the benefit of its minority shareholders, including Shepard, and acted to promote the interests of EMCC to the detriment of EMCI and its minority shareholders.

133.     As a direct and proximate result of the breaches of fiduciary duty by EMCC and Kelley, Shepard has been directly damaged, which entitles him to monetary damages in an amount to be proven at trial.

**Non-Public Version Filed Under Seal**

134.    EMCC and Kelley's breaches were willful and in reckless disregard for the rights of minority shareholders.

## PRAYER FOR RELIEF

WHEREFORE, Shepard prays that this Court order judgment in his favor and against EMCI, and award Shepard the following relief:

A.    Compensatory damages in an amount to be determined at trial, but far exceeding $75,000;

B.    Punitive damages;

C.    Attorneys' fees and costs;

D.    Any and all such further relief as this Court deems just and proper.

## JURY DEMAND

Shepard demands trial by jury on all claims for damages.

OF COUNSEL:                                   */s/ Matthew L. Preston*

Thomas K. Cauley, Jr.                         Brad J. Brady
Steven E. Sexton                              Matthew L. Preston
Benjamin I. Friedman                          **Brady Preston Gronlund, P.C.**
Ross O. Kloeber                               2735 1st Avenue SE
**SIDLEY AUSTIN LLP**                         Cedar Rapids, IA 52402
One South Dearborn                            (319) 866 9277
Chicago, IL 60603
(312) 853-7000                                *Attorneys for Plaintiff Gregory M. Shepard*

41

**Non-Public Version Filed Under Seal**